UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESEANTA RODERICK
THOMPKINS, 500757,

      Petitioner,                                    CASE NO. 18-11775

v.                                                            HON. Paul D. Borman

TONY TRIERWEILER,                               MAG. Stephanie Dawkins
                                                                   Davis

      Respondent.

_____

**ANSWER IN OPPOSITION TO PETITION FOR WRIT OF
HABEAS CORPUS**

# TABLE OF CONTENTS

Introduction ................................................................................ 1

    Statements in Compliance with Habeas Rule 5(b) .......................... 3

    A.    Statute of Limitations ................................................ 3

    B.    Exhaustion .............................................................. 3

    C.    Procedural Default ................................................... 3

    D.    Non-retroactivity Doctrine ....................................... 3

Statement of the Case ................................................................ 4

    A.    Trial Facts ............................................................... 4

    B.    Procedural History ................................................. 10

Standard of Review Pursuant to AEDPA ................................. 12

Argument ................................................................................. 17

I.    The Michigan Court of Appeals reasonably rejected Habeas Claim I, alleging a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), on the merits where the evidence was not exculpatory or material. ................................................... 17

    A.    The state appellate court's decision ...................... 17

    B.    Clearly established federal law regarding disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963) ...................... 19

    C.    Analysis ................................................................ 21

    D.    Harmless error ..................................................... 24

II.    The Michigan Court of Appeals reasonably rejected Habeas Claim II, alleging a violation of the right to present a defense, on the merits where the state courts properly excluded a witness's statement as hearsay. ................. 25

i

A.   The state appellate court's decision ....................................... 26

B.   Clearly established federal law regarding the right to present a defense ................................................................... 29

C.   Analysis ................................................................................ 32

D.   Harmless error .................................................................... 35

III.   The Michigan Court of Appeals reasonably rejected Habeas Claim III, alleging a Confrontation Clause violation, on the merits where the witness's statement was not testimonial. ......... 36

A.   The state appellate court's decision ....................................... 37

B.   Clearly established federal law regarding confrontation ..... 38

C.   Analysis ................................................................................ 40

D.   Harmless error .................................................................... 41

Conclusion ........................................................................................ 42

Relief ................................................................................................ 47

Certificate of Service ....................................................................... 48

## INTRODUCTION

Petitioner, Deseanta Thompkins, participated in the murder of Jonathon Stokes at a bus stop in Detroit.  Thompkins and his co-defendants shot Stokes five times from behind—four times in the legs and once in the head—and then rifled through his pockets and left him for dead.

As a result of his Wayne County jury-based conviction of first-degree premeditated murder, Mich. Comp. Laws § 750.316, the State now holds Thompkins in custody in the Michigan Department of Corrections.  Thompkins is currently serving a sentence of life imprisonment without the possibility of parole.

Thompkins commenced this action under 28 U.S.C. § 2254 by filing a petition with this Court.  The State understands the petition to be raising the following claims:

I.    Due process violation: Withholding and supression [sic] of material evidence by the prosecution.

II.    Denial of right to a fair trial: A recorded interview which contains exculpatory statements by a co-defendant were included in his jury, but excluded from my own.

III.    Confrontation Clause Violation: I was deprived of my rights under the confrontation clause at trial.

Should the Court interpret the petition to be raising different claims, the State requests an opportunity to file a supplemental pleading.  To the extent that Thompkins failed to raise any other claims that he raised in the state courts, those claims are now abandoned. *See Sommer v. Davis*, 317 F.3d 686, 691 (6th Cir. 2003) (holding that an issue is abandoned if a party does not present any argument respecting the issue in his brief).  Thus, habeas review of abandoned claims is barred.

The State now answers the petition and requests that it be denied.

# STATEMENTS IN COMPLIANCE WITH HABEAS RULE 5(b)

With respect to the bars that preclude habeas review, the State asserts the following in conformance with Habeas Rule 5(b):

## A.    Statute of Limitations

The State is not arguing that any of Thompkins' habeas claims are barred by the statute of limitations.

## B.    Exhaustion

The State is not arguing that consideration of any of Thompkins' habeas claims is barred by the failure to exhaust a claim for which a state court remedy exists.

## C.    Procedural Default

The State is not arguing that consideration of any of Thompkins' habeas claims is barred by an unexcused procedural default.

## D.    Non-retroactivity Doctrine

The State is not arguing that consideration of any of Thompkins' claims is barred by the non-retroactivity doctrine.

## STATEMENT OF THE CASE

### A.    Trial Facts

The Michigan Court of Appeals accurately summarized the facts

adduced at trial as follows:

> The twenty-five year old victim in this case, Jonathon
> Michael Stokes (a/k/a "Slim"), was found shot to death near a
> bus stop in the City of Detroit on July 31, 2013. The victim's
> identification was found next to his body. His front pockets
> were turned inside out as though someone had rummaged
> through his pockets and his Cartier glasses were nowhere to
> be found. The victim had been shot five times—four times in
> the legs and once in his head; all shots were from behind.
> The four bullets recovered from the victim's body revealed
> that all bullets came from the same barrel of a .38 caliber
> weapon.
>
> Defendants were charged in the victim's murder and were
> tried together. Deseanta and Leander are cousins. Deseanta
> was also known as "D," "De" or "Day." Leander was
> sometimes referred to as "Le Le." Although tried together,
> there were two juries—one for Leander and another for
> Deseanta and Lee. At trial, it was the prosecutor's theory
> that defendants were upset with the victim and thought he
> was a "snitch." In contrast, defendants argued that this was
> a case of mistaken identity and that the shooter was actually
> Leander's cousin, Dejuan Griffin (Griffin), whose street
> name was similar to Deseanta's—"Da Da."
>
> Jeffrey Pursey testified that on the night of the murder he
> was on his way to a liquor store on Seven Mile between
> Grand River and Telegraph to meet a friend and go to the
> casino. Pursey was unable to pull into the driveway of the
> liquor store because there were three individuals in the way.
> One individual had on dark pants and a black hoody.
> Another had on dark pants and a white shirt. Pursey was

4

not entirely sure what the third individual was wearing, but knew he was wearing dark clothing. At trial, Pursey identified Lee as the one in the white t-shirt and Deseanta as the one in the hoody. Pursey testified that Lee actually waved Pursey into the parking lot. Pursey's friend arrived within a couple of minutes. Pursey put his phone and charger on his friend's front seat and was planning to go into the liquor store to grab a drink when he heard five gunshots.

Pursey went up to Seven Mile and saw the same three individuals running toward him. Pursey grabbed his phone from his friend's car and dialed 911 while driving to the area. He saw a body lying on the ground. Pursey called 911 and later gave Detective Detrick Mott a written statement and identified Lee from a photo array as the individual who waved him into the parking lot and the one he later saw running towards him. Pursey identified Deseanta from another array as the individual in the black hoody.

All three defendants attacked the credibility of Pursey's testimony because the victim's family had given Pursey $12,000 before trial as a reward for his cooperation. The victim's mother, Dorothy Strong–Stokes, testified that she and her husband had originally put up a $27,500 reward with Crime Stoppers, hoping to apprehend their son's killers. Although Pursey provided critical information in the case and had testified at several preliminary examinations, Crime Stoppers informed Strong–Stokes that Pursey did not qualify to receive the reward because he had not made a tip directly to them. Crime Stoppers told Strong–Stokes that if she wanted Pursey to have the money, she would have to do it herself. They returned the Stokes' money. Strong–Stokes testified that she felt $12,000 was a fair reward. She did not intend the payment as a bribe for Pursey's testimony. Pursey denied that the $12,000 influenced his testimony at a later preliminary examination or at trial. In fact, when Pursey gave his statement to police and positively identified Lee and Deseanta, he was unaware that there was a reward through Crime Stoppers.

The only witness at the bus stop the night of the murder was Castro Pettway. Pettway saw three individuals approaching from the east. One had on a black hoody and another was wearing a white t-shirt. They stopped about 40 feet before the bus stop and were talking amongst themselves. They continued to approach the bus stop when the individual wearing the hoody mentioned something to the victim about a bus and pulled out a gun. Pettway heard and saw the first shot fired and then ran. He heard three or four more shots. Pettway waited approximately five minutes and then went back to retrieve his bag. Pettway could not identify the shooters at trial.

Walter Williams was doing some maintenance in the area where the murder occurred. He heard four gunshots in the distance. From a window, Williams could see that there was a man on the ground and four others around him. Three of the men were kneeling down and appeared to be going through the man's pockets. Like Pettway, Williams could not identify any of the individuals at trial.

Another key witness for the prosecution was Diamond Ruff (Ruff), who testified that she was with all three defendants the night of the shooting. Ruff testified that she had known the victim for seven years and he was once her best friend. She knew Lee as "Will," Deseanta as "De" (the letter), and Leander as "Lee" or "Lee Lee ." Ruff testified that both the victim and defendants sold marijuana.

On the day of the murder, Ruff had been drinking Cognac since the morning. She also had been smoking "kush," which she described as a more "exotic" and "stronger" form of weed. Ruff was riding around with defendants in Lee's Yukon or Suburban. She probably "dozed off" in the car from smoking and drinking. At approximately 10:00 p.m., Deseanta went to the store to buy more liquor and blunts. Lee received a phone call and told the caller, "be there in a minute." All three defendants then got out of the car. Defendants returned after approximately 10 minutes. They seemed

6

"hyped up" so Ruff asked them what was happening. Leander said, "I got that n* * * * *, I got that n* * * * *." In her statement to police, Ruff said that Defendant Leander Thompkins said, "I got that n* * * * *, I got that n* * * * * ... I had to pop a n* * * * * a couple of times. That n* * * * * got handled."

Ruff did not know what Leander was talking about. Defendants dropped her off at a friend's house. While at her friend's house, Ruff received a call that the victim was dead. Ruff put together a candlelight vigil, which defendants attended. Although Ruff could have contacted the victim's parents with information about the murder, she was scared to do so. Ruff eventually gave Mott a statement and identified defendants from photo arrays.

As part of his investigation, Mott went to the liquor store to see if there was useable surveillance footage. Because the footage ran a ten hour loop, Mott had to capture the video on his phone's camera. Therefore, as the parties acknowledged, the footage was not good. The jury watched the surveillance video from inside and outside the store.

Mott testified that Lee gave police a statement on November 22, 2013. The video was played for the Deseanta/Lee jury, only. In the statement, Lee told Mott that Leander was there at the time of the shooting, but blamed the shooting on "Day" or "Day Day" (Griffin), who shot the victim because "he was snitching or being an informant in the neighborhood."

Mott testified that Leander also made an informal statement to police on November 22, 2013 at which time Leander indicated he was with his cousin at the time of the shooting. Mott spoke with Leander a second time on November 25, 2013. Leander denied that he was present during the murder, but implicated his cousin, Griffin, saying "that's the kind of person he is." Leander demonstrated for Mott how Griffin shot the victim. Griffin had asked Dwayne Haywood[2] to borrow a weapon, but Leander did not think

7

Griffin was going to kill the victim. Leander vehemently denied being part of the crime. He was released from custody shortly after making his statement, but was later re-arrested after Mott had a chance to interview Ruff and learned that Leander admitted to shooting the victim.

In front of the Deseanta/Lee jury, only, Hasheem Beamon testified that, on the night of the murder, he was with defendants, as well as Haywood, "Da Da" (Griffin) and "50." At some point, Leander, "Da Da" and "50" left; neither Lee nor Deseanta went with them. Shortly after they left, Beamon heard gunshots. The men returned and Leander said that they shot someone named "Slim." Leander said he shot first and then "Da Da" took the gun and "finished him off ." They told Beamon that "Slim" was a snitch: "They told me they had to kill a n* * * * *." Beamon gave Mott a statement on February 19, 2014, identifying both Leander and Deseanta, but adding that Deseanta and Lee "didn't have s* * * to do with this."[3]

Brandy Harris testified that the victim was her cousin. She was planning to pick him up the night of the murder. In a phone call earlier that day, the victim reported that he had just had a fight with someone who had called him a snitch. Harris remembered that one of the houses that the victim frequented had been raided. Later, Harris saw that a Caucasian man had the victim's phone and when Harris asked the man where the victim was, he told her that the victim had gone to the gas station. After learning that the victim had been shot, Harris went to retrieve the victim's phone from the Caucasian man, who threw it at her. Mott acknowledged that a white man on Wormer, Patrick Boggs, was later arrested on unrelated charges. Mott did not believe Boggs was connected to the homicide.

In front of the Deseanta/Lee jury, only, Shenequia Carr (Peaches) testified that she was with Deseanta at her house at the time of the murder. They heard shots and police sirens and walked to where the shooting occurred. In a surveillance

8

photo, Carr identified the man in a hoody as "Da Da," whom she also saw that night. Carr testified she saw Lee with Haywood a couple of doors down. She did not see Ruff with any of the defendants.

Although Leander, Haywood's widow (Roslyn Haywood), Beamon, and Carr, accused "Da Da" (Griffin) of being responsible for the crime, attempts at locating him were unsuccessful. Mott admitted that he initially associated "Da Da" with Deseanta.

Defendants were convicted and sentenced as outlined above.

*People v. Thompkins*, No. 326028, 2016 WL 4212142, at *1–4 (Mich. Ct. App. Aug. 9, 2016).  This recitation of the facts is entitled to the presumption of correctness under § 2254(e)(1), and Thompkins has not demonstrated through clear and convincing evidence that this summary is incorrect.

The presumption of correctness extends to factual findings made by state appellate courts on the basis of their review of trial court records.  *Treesh v. Bagley*, 612 F.3d 424, 430 n.1 (6th Cir. 2010); *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001) (citing *Sumner v. Mata*, 449 U.S. 539, 546–47 (1981)).

The State opposes any factual assertions made by Thompkins that are not directly supported by—or consistent with—the state court record, because Thompkins has failed to overcome the presumption of

9

factual correctness under 28 U.S.C. § 2254(e)(1) or meet the

requirements of 28 U.S.C. § 2254(e)(2).

## B.    Procedural History

Thompkins was convicted of first-degree premeditated murder.

The trial court sentenced him to life imprisonment without parole.

Following his conviction and sentence, Thompkins filed a claim of

appeal in the Michigan Court of Appeals, which raised the following

claims:

I.    Was Defendant []denied due process and a fair trial
      when the prosecution failed to provide discovery on
      numerous occasions and a mistrial should have been
      granted?

II.   Was Defendant denied the right to due process and
      fundamental fairness to present a defense when he was
      not allowed to present the co-defendant's admission
      that exonerated him?

III.  Did the trial court err when admitting Defendant's
      trial statements of co-defendant Leander Thompkins to
      Diamond Ruff as an excited utterance and statement
      against interest and allowing Ruff to identify
      Defendant from the store video?

The Michigan Court of Appeals affirmed Thompkins' conviction in

an unpublished opinion.  *Thompkins*, 2016 WL 4212142, at *11.

Thompkins subsequently filed an application for leave to appeal in the Michigan Supreme Court, which raised the same claims as in the Michigan Court of Appeals.  The Michigan Supreme Court denied the application because it was not persuaded that the questions presented should be reviewed by the Court.  *People v. Thompkins*, 890 N.W.2d 661 (Mich. 2017) (unpublished table decision).

Thompkins did not appeal to the United States Supreme Court or seek collateral review before the trial court.  Rather, he filed the instant petition for habeas relief.

## STANDARD OF REVIEW PURSUANT TO AEDPA

Thompkins' habeas petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  AEDPA prevents a federal court from granting habeas corpus relief based on any claim "adjudicated on the merits" in state court, unless the petitioner can establish that the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d)(1), the petitioner must establish that "the state court arrive[d] at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decide[d] a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Metrish v. Lancaster*, 569 U.S. 351, 357 n.2 (2013) (internal quotation marks and citation omitted).

Under the "unreasonable application" clause of § 2254(d)(1), the petitioner must establish that, after "identif[ying] the correct governing legal principle from the Supreme Court's decisions, [the state court] unreasonably applie[d] that principle to the facts of [his] case." *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (alteration omitted). "[T]he state court's decision must have been more than incorrect or erroneous[;]" rather, it must have been "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003)).  "[E]ven clear error will not suffice." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).  Again, the state court's determinations of law and fact must be "so lacking in justification" as to give rise to error "beyond any possibility for fairminded disagreement." *Dunn v. Madison*, 138 S. Ct. 9, 12 (2017) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Moreover, not just any Supreme Court decision will do under § 2254(d)(1).  "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta," of the Supreme Court's decisions.  *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per

13

curiam) (internal quotations and citations omitted).  Where no Supreme

Court case has confronted "the specific question presented" by the

habeas petitioner, "the state court's decision [cannot] be contrary to any

holding from this Court."  *Woods v. Donald*, 135 S. Ct. at 1377 (internal

quotation marks and citation omitted).  Moreover, the Supreme Court

decision must have been on the books at "the time the state court

render[ed] its decision."  *Greene v. Fisher*, 565 U.S. 34, 38 (2011)

(internal quotation marks and emphasis omitted); *see also Cullen v.

Pinholster*, 563 U.S. 170, 182 (2011) ("State-court decisions are

measured against [the Supreme] Court's precedents as of the time the

state court renders its decision.") (internal quotation marks omitted).

　　"It is not an unreasonable application of clearly established

Federal law for a state court to decline to apply a specific legal rule that

has not been squarely established by this Court."  *Richter*, 562 U.S. at

101 (internal quotation marks and citation omitted).  As the Supreme

Court has repeatedly pointed out, "circuit precedent does not constitute

clearly established Federal law, as determined by the Supreme Court."

*Kernan v. Cuero*, 138 S. Ct. 4, 8 (2017) (per curiam) (quoting *Glebe v.

Frost*, 135 S. Ct. 429, 430 (2014)) (per curiam).  Likewise, neither do

14

"state-court decisions, treatises, or law review articles" constitute clearly established Federal law as determined by the Supreme Court. *Cuero*, 138 S. Ct. at 8.

And federal court of appeals precedent cannot "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 63 (2013) (per curiam) (citation omitted); *see also Lopez v. Smith*, 135 S. Ct. 1, 4 (2014) (providing that absent a decision by the Supreme Court addressing "the specific question presented by [a] case" a federal court cannot reject a state court's assessment of claim).

Under § 2254(d)(2), the "unreasonable determination" subsection, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Wood v. Allen*, 558 U.S. 290, 293 (2010). "[A] state-court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571 U.S. 12, 15 (2013) (internal quotation marks and citation omitted).

The Supreme Court has also instructed habeas courts to apply a rebuttable presumption that a "federal claim was adjudicated on the merits" even "[w]hen a state court rejects a federal claim without expressly addressing that claim." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). *See also Kernan v. Hinojosa*, 136 S. Ct. 1603, 1606 (2016) (per curiam) ("Containing no statement to the contrary, the Supreme Court of California's summary denial of Hinojosa's petition was therefore on the merits.").

Finally, Thompkins' burden is made even heavier by the fact that a federal court is "limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

# ARGUMENT

**I.     The Michigan Court of Appeals reasonably rejected Habeas Claim I, alleging a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), on the merits where the evidence was not exculpatory or material.**

In Habeas Claim I, Thompkins contends that the prosecution

failed to disclose three pieces of evidence in violation of *Brady v.*

*Maryland*, 373 U.S. 83 (1963): (1) Leander's recorded police statement,

(2) the fact that Pursey received $12,000 from the victim's family, and

(3) evidence that Thompkins was seen ripping down Crime Stoppers

posters.  But the Michigan Court of Appeals reasonably rejected this

claim on the merits, holding that (1) Leander's statement was

inadmissible and therefore immaterial, (2) Pursey's money was

disclosed during trial before Pursey testified, and (3) Thompkins' act of

ripping down the Crime Stoppers posters was inculpatory, not

exculpatory.  Thus, Thompkins is not entitled to habeas relief on this

claim.

### A.     The state appellate court's decision

The Michigan Court of Appeals rejected this claim on the merits:

Deseanta argues that he was deprived of due process and a
fair trial when the trial court failed to grant his motion for

mistral, which was based on the prosecutor's various *Brady*[4] violations. We disagree.

Defendant's claim that he was denied due process is reviewed de novo. *People v. Schumacher,*276 Mich.App 165, 176; 740 NW2d 534 (2007).

"The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. In order to establish a *Brady* violation, the test is whether "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v. Chenault,* 495 Mich. 142, 155; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id.* at 150. Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 150, quoting *United States v. Bagley,* 473 U.S. 667, 682; 105 S Ct. 3375, 87 L.Ed.2d 481 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Chenault,* 495 Mich. at 150. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial...." *Kyles v. Whitley,* 514 U.S. 419, 434; 115 S Ct 1555; 131 L.Ed.2d 490 (1995).

Deseanta first argues that the prosecutor failed to provide him with Leander's recorded police interview in which Leander inculpated Griffin and exculpated Deseanta. However, as will be discussed in further detail later in this opinion, the evidence was inadmissible in Deseanta's case because Leander's statement was not against Leander's penal interest and lacked sufficient corroborating evidence of trustworthiness. Because the evidence was inadmissible, it cannot be considered material.

Deseanta next argues that the prosecutor suppressed evidence that Pursey had received $12,000 from the victim's family as a "reward." Mott testified that he learned Pursey had received the money following the final preliminary hearing in July 2014. Mott should have brought that information to the prosecutor's attention prior to trial, which started several months later in December 2014. Such evidence called into question Pursey's credibility. Still, Deseanta was not deprived of a fair trial. Evidence relating to the $12,000 played a significant role at trial. All of the defendants vigorously attacked Pursey's credibility and the jury was made fully aware that he had been paid prior to trial.

Finally, Deseanta complains that defense counsel was not made aware that Mott saw the defendants pulling down Crime Stopper flyers because such information was not included in Mott's reports. However, as the prosecutor points out, Deseanta fails to indicate how this evidence was favorable to him. In fact, evidence that Deseanta was seen taking down Crime Stoppers posters seems rather incriminating. To the extent Deseanta argues that the evidence (or lack thereof) was relevant to Mott's overall credibility, defense counsel pursued Mott's failure to include the information in his reports. The jury was, therefore, apprised of Mott's alleged lack of credibility. There is simply no indication that the "evidence" was material to Deseanta or deprived him of a fair trial.

*Thompkins*, 2016 WL 4212142, at *4–5.

### B.   Clearly established federal law regarding disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963)

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States

Supreme Court held that "suppression by the prosecution of evidence

favorable to an accused upon request violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

To prove prejudice (and materiality) under *Brady*, a petitioner must show that "the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.  "A reasonable probability of a different result is . . . shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks and citations omitted).  That is, to establish a *Brady* violation, a petitioner must show "that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.  "No *Brady* violation occurs, however, where a defendant knew or should have known the essential

facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source." *Workman v. Bell*, 178 F.3d 759, 767 (6th Cir. 1998), *cert. denied*, 528 U.S. 913 (1999) (internal quotation marks and citation omitted).

"The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). But the same is not true with respect to preserving potentially exculpatory evidence. *Id.* The Supreme Court has refused to impose on the police "an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution." *Id.* at 58. Thus, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*

## C.   Analysis

In this case, Thompkins argues that the prosecution withheld three pieces of evidence in violation of *Brady v. Maryland*. First, he

points to the recording of Leander's statement to police in which

Leander stated that his cousin, Griffin, committed the murder.  But, as

the Michigan Court of Appeals held, that evidence was not admissible

and therefore could not have been material under *Brady*.  *Thompkins*,

2016 WL 4212142, at *4; *see also* Argument II(C), *infra*.  Indeed, that is

accurate.  "[W]ithheld information is material under *Brady* only if it

would have been admissible at trial or would have led directly to

admissible evidence."  *Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir.

2014).  The Sixth Circuit has noted that inadmissible information "is

not evidence at all" for purposes of *Brady* and therefore cannot directly

affect the outcome of a trial.  *Wogenstahl v. Mitchell*, 668 F.3d 307, 325

n 3 (6th Cir. 2012) (internal citation and quotation marks omitted).

Thus, because Leander's police statement was inadmissible hearsay, it

could not have been material under *Brady*.  Thompkins' claim fails on

this point.

Thompkins next claims that the prosecutor failed to inform the

defense that Pursey received $12,000 from the victim's family for

coming forward with his eyewitness account.  The Michigan Court of

Appeals noted that, while that fact had not been disclosed prior to trial,

22

it was disclosed *during* trial when the prosecution was made aware of it and Pursey's credibility was questioned significantly in light of it during trial. (12/15/14 Trial Tr. at 99–106, 125–29, 135–36, 139–43, 155–59.) Thus, the information was available to the defense at that point, and the jury was made well aware of that fact at trial to consider it during their deliberations. Given that, Thompkins necessarily could not have suffered any prejudice from the *late*—not non—disclosure. Thompkins' claim on this point fails as well.

Finally, Thompkins contends that the prosecution failed to disclose evidence that Thompkins was seen ripping down Crime Stoppers posters. But, again as the Michigan Court of Appeals found, that evidence was not even exculpatory and thus did not require disclosure. In fact, that evidence tended to *inculpate* Thompkins in that it could reasonably be construed as him trying to prevent people from talking about or reporting what they saw. This claim fails the *Brady* test on its face.

Accordingly, the state courts' rejection of these *Brady* claims on the merits was objectively reasonable: Thompkins is not entitled to habeas relief on this claim.

23

### D.   Harmless error

A habeas petitioner is not entitled to relief based on State trial-court error unless he demonstrates that the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993); *Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015).  A showing of "substantial and injurious effect or influence" means "actual prejudice."  *Gover v. Perry*, 698 F.3d 295, 299 (6th Cir. 2012) (citing *Brecht*, 507 U.S. at 637).  *See also Davis v. Ayala*, 135 S. Ct. 2187, 2197–98 (2015).  This means that the habeas court is left in "grave doubt" over a matter so "evenly balanced" that the court concludes it is in a "virtual equipoise" as to the harmlessness of the error.  *Davis*, 135 S. Ct. at 2211 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).

Here, the state court addressed whether the alleged constitutional error was harmless, concluding that it was in fact harmless in finding that the evidence was immaterial under *Brady*.  *Thompkins*, 2016 WL 4212142, at *4–5.  That determination is subject to AEDPA deference and Thompkins has not overcome his significant burden under AEDPA.

24

*Davis v. Ayala*, 135 S. Ct. 2187, 2198–99 (2015).  *See also Welch v. Hepp*, 793 F.3d 734, 738–39 (7th Cir. 2015).

But harmless error also applies even where the state appellate court did not recognize the error and review the claim for harmlessness. *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007).  To the extent the Michigan Court of Appeals did not conduct an explicit harmlessness analysis, any errors were harmless, nonetheless.  Because the alleged errors were not material, they necessarily could not have been prejudicial.

Accordingly, Thompkins is not entitled to habeas relief on this claim.

## II.   The Michigan Court of Appeals reasonably rejected Habeas Claim II, alleging a violation of the right to present a defense, on the merits where the state courts properly excluded a witness's statement as hearsay.

In his second habeas claim, Thompkins contends that the state courts deprived him of his right to present a defense in precluding the admission of Leander's statement to police that his cousin, Griffin, was the shooter.  But the state courts reasonably rejected this claim on the merits, holding that Leander's statement was inadmissible hearsay. Accordingly, Thompkins is not entitled to habeas relief on this claim.

## A.    The state appellate court's decision

The Michigan Court of Appeals rejected this claim on the merits:

Deseanta next argues that he was deprived of the right to present a defense when the trial court refused to allow Deseanta to introduce Leander's statement to police. We disagree.

"This Court ... reviews de novo the constitutional question whether a defendant was denied [his] constitutional right to present a defense." *People v. Kurr,* 253 Mich.App 317, 327; 654 NW2d 651 (2002). "This Court reviews preserved evidentiary issues for an abuse of discretion. A trial court abuses its discretion when it chooses an outcome that is outside the range of reasonable and principled outcomes." *People v. Orr,* 275 Mich.App 587, 588–589; 739 NW2d 385 (2007) (internal footnote omitted).

"A criminal defendant has a right to present a defense under our state and federal constitutions," which necessarily includes evidence that "might influence the determination of guilt." *People v. Anstey,* 476 Mich. 436, 460; 719 NW2d 579 (2006). Deseanta argues that his right to present a defense was impacted when the trial court prevented him from presenting Leander's statement to police as evidence at trial. In Leander's November 25, 2013 statement, Leander implicated his cousin Griffin, indicating that Griffin had an argument with the victim, borrowed a gun, and boasted of shooting the victim.

Leander's statement to police was hearsay. " 'Hearsay' is a statement, other than the one made by the defendant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(d). Hearsay is not admissible except as provided by the rules of evidence. A statement against penal interest is only admissible if the declarant is unavailable.[5] MRE 804(b)(3) provides:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The trial court correctly concluded that Leander's statement to police did not constitute a statement against his own penal interest; instead, Leander asserted that he was merely present when some of the discussions took place and otherwise vehemently denied any wrongdoing. Leander's statement did not, on its face, facially expose Leander to criminal liability.

In any event, even if Leander's statement could be construed as against his penal interest, because the statement was offered to exculpate Deseanta from criminal liability, an additional hurdle had to be cleared. As the proponent of the evidence, Deseanta had to show that corroborating circumstances clearly indicated the trustworthiness of Leander's statement. MRE 804(b)(3). In *People v. Poole,* 444 Mich. 151, 163; 506 NW2d 505 (1993), overruled in part by *People v. Taylor,* 482 Mich. 368, 378; 759 NW2d 361 (2008), the Supreme Court discussed "[t]he indicia of reliability necessary to establish that a hearsay statement has particularized guarantees of trustworthiness" and concluded:

> In evaluating whether a statement against penal interest that inculpates a person in addition to the declarant bears sufficient indicia of reliability

27

to allow it to be admitted as substantive evidence against the other person, courts must evaluate the circumstances surrounding the making of the statement as well as its content.

The presence of the following factors would favor admission of such a statement: whether the statement was (1) voluntarily given, (2) made contemporaneously with the events referenced, (3) made to family, friends, colleagues, or confederates—that is, to someone to whom the declarant would likely speak the truth, and (4) uttered spontaneously at the initiation of the declarant and without prompting or inquiry by the listener.

On the other hand, the presence of the following factors would favor a finding of inadmissibility: whether the statement (1) was made to law enforcement officers or at the prompting or inquiry of the listener, (2) minimizes the role or responsibility of the declarant or shifts blame to the accomplice, (3) was made to avenge the declarant or to curry favor, and (4) whether the declarant had a motive to lie or distort the truth. [*Id.* at 165.]

Granted, and as discussed in further detail below, *Poole* was subsequently partially overruled in *Taylor* to the extent *Poole* found that the Confrontation Clause had any application to nontestimonial statements. And Leander's statement was not being used as substantive evidence against another person. But the factors *Poole* discusses when looking to whether a statement has sufficient indicia of trustworthiness is still helpful. Here, Leander's statement was made to law enforcement during an interrogation at which time Leander minimized his role and shifted blame to Griffin. Leander had a strong motivation to lie or distort the truth and his statement was primarily self-serving. Under

those circumstances, it cannot be said that Leander's statement to police had sufficient corroborating circumstances indicating the trustworthiness of his statement. The trial court, therefore, did not abuse its discretion in refusing to permit Deseanta to present the statement to the jury.

Although the trial court refused to permit Deseanta to present Leander's statement to the jury, Deseanta was not denied his right to present a defense and, in fact, placed blame for the shooting squarely on Leander and Griffin. At trial, Beamon testified that Leander and Griffin admitted to shooting "Slim" for being a snitch, with Leander firing the first shot and Griffin "finishing him off." Beamon gave Mott a statement on February 19, 2014, identifying both Leander and Deseanta, but adding that Deseanta "didn't have s* * * to do with this." Additionally, in his statement to police, Lee blamed the shooting on Griffin. Deseanta was able to present the jury with his theory that he was mistaken for Griffin based on their similar street names. Defendant was not denied his right to present a defense.

*Thompkins*, 2016 WL 4212142, at *5–7.

## B. Clearly established federal law regarding the right to present a defense

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . . the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations and quotation marks omitted). Accordingly, "[j]ust as

a State may not apply an arbitrary rule of competence to exclude a material defense witness from taking the stand, it also may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987).

But the right to present a defense is not unfettered—it may bow to state rules of evidence and procedure. *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *Taylor v. Illinois*, 484 U.S. 400, 410 (1988) (holding that evidence that is incompetent, privileged, or otherwise excluded by the rules of evidence may be constitutionally precluded). For example, "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006). "[T]he proposition that the Due Process Clause guarantees the right to introduce all relevant evidence is simply indefensible." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).

Further, "[d]ue process does not require that a defendant be permitted to present any defense he chooses," and "states are allowed to

define the elements of, and defenses to, state crimes." *Lakin v. Stine*,

80 Fed. App'x 368, 373 (6th Cir. 2003) (citing *Apprendi v. New Jersey*,

530 U.S. 466, 484-87 (2000) & *McMillan v. Pennsylvania*, 477 U.S. 79,

84-86 (1986)).  A state's determination of defenses is not subject to

federal habeas review; a federal court may not "reexamine state-court

determinations of state-law questions." *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991).

In addition, a right-to-present-a-defense claim is subject to

harmless error analysis.  *Fleming v. Metrish*, 556 F.3d 520, 536 (6th

Cir. 2009), *cert. denied*, 130 S. Ct. 103 (2009).  Because a state trial

court possesses considerable discretion in limiting the extent of cross-

examination, "the inquiry for the reviewing court is 'whether the jury

had enough information, despite the limits placed on otherwise

permitted cross-examination, to assess the defense theory.'"  *Stewart v.

Wolfenbarger*, 468 F.3d 338, 347 (6th Cir. 2006) (quoting *Dorsey v.

Parke*, 872 F.2d 163, 167 (6th Cir. 1989)).

On habeas review, a federal court does not "determine whether

the exclusion of the evidence by the trial judge was correct or incorrect

under state law, but rather whether such exclusion rendered

petitioner's trial so fundamentally unfair as to constitute a denial of federal constitutional rights." *Lewis v. Wilkinson*, 307 F.3d 413, 420 (6th Cir. 2002) (quoting *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982)).

### C.   Analysis

Here, Thompkins contends that the state courts erred in excluding Leander's statement to police.  Not so.

First, to the extent Thompkins challenges the evidentiary ruling under Michigan Rule of Evidence 804(b)(3), that claim is not cognizable on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).  Thus, that aspect of Thompkins' claim cannot entitle him to federal habeas relief.

An evidentiary error must violate due process to merit habeas relief.  *Cowans v. Bagley*, 639 F.3d 241, 248 (6th Cir. 2011).  "A state evidentiary ruling . . . rises to the level of a due process violation only if admitting the evidence 'so infused the trial with unfairness as to deny [the defendant] due process of law.'"  *Cowans*, 639 F.3d at 248 (quoting *Estelle*, 502 U.S. at 62).  "Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[]

32

some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)).  In addition, such claims are subject to harmless-error analysis. *Coley v. Bagley*, 706 F.3d 741, 753 (6th Cir. 2013).  Here, Thompkins' related due-process claim under the right to present a defense fails.

A petitioner's right to present a defense does not grant the petitioner immunity from complying with state rules of evidence and procedure.  *See Scheffer,* 523 U.S. at 308.  While those rules may not be applied mechanistically to prevent a defendant from presenting evidence fundamental to his defense, the Supreme Court's cases "do not stand for the proposition that a petitioner's due process rights are violated any time a state court excludes evidence that the petitioner believes is the centerpiece of his defense." *Alley v. Bell,* 307 F.3d 380, 394 (6th Cir. 2002).  Rather, the cases "stand for the more limited proposition that a defendant's due process rights are violated when a state court excludes important evidence on the basis of an arbitrary, mechanistic, or per se rule, or one that is disproportionate to the

purposes it is designed to serve." *Id.* Importantly, "[o]nly rarely" has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson,* 569 U.S. 505, 509 (2013) (per curiam).

Here, the state courts properly excluded the evidence as hearsay, finding that the statement did not meet the exception under Mich. R. Evid. 804(b)(3), and therefore did not violate Thompkins' right to present a defense. This Court is bound by the state courts' construction of state law. *Missouri v. Hunter*, 459 U.S. 359, 368 (1983). The state courts thoroughly outlined why the statement did not meet the exception, including that the statement was not against Leander's penal interest, it was offered to exculpate Thompkins, and the statement lacked the requisite corroborating circumstances indicating its trustworthiness. *Thompkins*, 2016 WL 4212142, at *6. Thus, the courts' ruling did not deprive Thompkins of his right to present a defense. *See Bell v. Woods*, No. 10-13467, 2014 WL 11206412, at *17 (E.D. Mich. Apr. 15, 2014) (report and recommendation concluding that the state trial court "did not apply Rule 804(b)(3) arbitrarily or mechanistically," but rather "the court gave full consideration to the

34

factors . . . and gave detailed reasons for finding that those statements were not admissible under Rule 804(b)(3)."), adopted by the district court, *Bell v. Bergh*, 2016 WL 1223349, at *5 (E.D. Mich. Mar. 29, 2016).

Thus, the state courts' rejection of this claim was objectively reasonable: Thompkins is not entitled to habeas relief on this claim.

### D.    Harmless error

A habeas petitioner is not entitled to relief based on State trial court error unless he demonstrates that the error "had a substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 622; *Holland v. Rivard*, 800 F.3d 224, 243 (6th Cir. 2015).  A showing of "substantial and injurious effect or influence" means "actual prejudice."  *Gover v. Perry*, 698 F.3d 295, 299 (6th Cir. 2012) (citing *Brecht*, 507 U.S. at 637).  This means that the habeas court is left in "grave doubt" over a matter so "evenly balanced" that the court concludes it is in a "virtual equipoise" as to the harmlessness of the error.  *Davis v. Ayala*, 135 S. Ct. 2187, 2211 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).

Here, the state court addressed whether the alleged constitutional error was harmless, concluding that it was in fact harmless because

Thompkins was able to present his defense even without Leander's statement, namely that Leander and Griffin committed the murder, not Thompkins. *Thompkins*, 2016 WL 4212142, at *7. Indeed, the jury heard Beamon's statement to police that Thompkins "didn't have s*** to do with this." *Id.* That determination is subject to AEDPA deference and Thompkins has not shown that determination to be contrary to or an unreasonable application of any clearly established federal law. *Davis*, 135 S. Ct. at 2198–99. *See also Welch v. Hepp*, 793 F.3d 734, 738–39 (7th Cir. 2015).

Thus, Thompkins is not entitled to habeas relief on this claim.

## III.   The Michigan Court of Appeals reasonably rejected Habeas Claim III, alleging a Confrontation Clause violation, on the merits where the witness's statement was not testimonial.

Thompkins argues in his final claim that the admission of Leander's statement to Ruff violated his rights under the Confrontation Clause pursuant to *Bruton v. United States*, 391 U.S. 123 (1968). But that is not the case, as the Michigan Court of Appeals reasonably determined. Because Leander's statement was not testimonial, it did not implicate—let alone violate—the Confrontation Clause. Thus, Thompkins is not entitled to habeas relief on this claim.

36

## A.    The state appellate court's decision

The Michigan Court of Appeals rejected this claim on the merits:

Deseanta next argues that the trial court erred in admitting evidence of Leander's statement to Ruff because Leander's statement not only implicated himself, but also implicated Deseanta, who was allegedly with Leander at the time the statement was made. Deseanta's right to confrontation were violated because he was unable to cross-examine Leander, as set forth in *Bruton v. United States,* 391 U.S. 123, 127–128; 88 S Ct 1620; 20 L.Ed.2d 476 (1968). We disagree.

"Constitutional questions, such as those concerning the right to confront witnesses at trial, are reviewed de novo." *People v. Pipes,* 475 Mich. 267, 274; 715 NW2d 290 (2006).

A defendant's Sixth Amendment right to confront the witnesses against him is violated if the trial court allows the admission of a non-testifying codefendant's confession implicating the defendant at a joint trial. *Bruton,* 391 U.S. at 127–128; *Pipes,* 475 Mich. at 269. Additionally, out-of-court testimonial statements by nontestifying witnesses are not admissible under the Confrontation Clause unless the witness is unavailable and the defendant had an opportunity to cross-examine the witness. *Crawford v. Washington,* 541 U.S. 36, 51–52; 124 S Ct 1354; 156 L.Ed.2d 177 (2004); *People v. Nunley,* 491 Mich. 686, 698; 821 NW2d 642 (2012).

However, *Crawford* has no application in this case because Leander's statement was non-testimonial in nature. "[T]he right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of 'witnesses,' those people who bear testimony against a defendant." *People v. Fackelman,* 489 Mich. 515, 528; 802 NW2d 552 (2011). Our United States Supreme Court has explained:

The text of the Confrontation Clause ... applies to "witnesses" against the accused—in other words,

> those who "bear testimony." 2 N. Webster, An
> American Dictionary of the English Language
> (1828). "Testimony," in turn, is typically "[a]
> solemn declaration or affirmation made for the
> purpose of establishing or proving some
> fact." *Ibid.* An accuser who makes a formal
> statement to government officers bears testimony
> in a sense that a person who makes a casual
> remark to an acquaintance does not. The
> constitutional text, like the history underlying
> the common-law right of confrontation, thus
> reflects an especially acute concern with a specific
> type of out-of-court statement. [*Crawford,* 541
> U.S. at 51.][6]

Nor does *Bruton* have any application to this case because,
not only was Leander's statement non-testimonial, but
Leander did not specifically implicate Deseanta or Lee or
attempt to shift the blame for the shooting onto his
codefendants. When nontestimonial hearsay is at issue, the
states are afforded the opportunity to create their own rules
of admissibility. *Crawford,* 541 U.S. at 68. Thus, the relevant
inquiry is whether Leander's statement to Ruff qualifies
under the rules of evidence. The trial court found Leander's
statement admissible both as an excited utterance and as a
statement against penal interest.

*Thompkins*, 2016 WL 4212142, at *7–8.

## B.   Clearly established federal law regarding confrontation

"[I]n all criminal prosecutions, the accused shall enjoy the right . . 

. to be confronted with the witnesses against him."  U.S. Const. amend.

VI.  "[T]his provision bars 'admission of testimonial statements of a

witness who did not appear at trial unless he was unavailable to testify,

and the defendant had had a prior opportunity for cross-examination.'"
*Davis v. Washington*, 547 U.S. 813, 821 (2006) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)).  A statement is testimonial if it was made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.  *Crawford*, 541 U.S. at 52.

With respect to joint trials, *Bruton v. United States*, 391 U.S. 123 (1968), "held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant."  *Richardson v. Marsh*, 481 U.S. 200, 207 (1987).

But "[b]ecause it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."  *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009).  Confessions typically fall under the Confrontation Clause because they are given to police officers during custodial interviews, which are testimonial.  *Crawford*, 541 U.S. at 52.

### C.   Analysis

Here, the Michigan Court of Appeals rightly held that the Confrontation Clause was not even implicated because the statement at issue was not testimonial.  Typically, *Bruton* claims regard police interviews with the co-defendants wherein the co-defendant implicates the defendant in the crime of which both are charged.  "Statements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard."  *Crawford*, 541 U.S. at 52.

But that was not the case here.  Thompkins contests the admission of Leander's statement to Ruff that he "got that n*****" after disappearing with Thompkins for a period of time.  But that statement was not testimonial under *Crawford*.  It was not made in anticipation of litigation; indeed, the statement was from one friend to another before the police were ever involved in the case.  Accordingly, the statement was not testimonial and therefore did not implicate, let alone violate, the Confrontation Clause.  *See Irvin v. Winn*, No. 17-1082, 2017 WL 7048968, at *1 (6th Cir. Sept. 6, 2017) ("Because Irvin has failed to show that the [text] messages were testimonial in nature, reasonable

40

jurists would not debate the district court's denial of relief on this claim [under the Confrontation Clause].").

Consequently, Thompkins is not entitled to habeas relief on this claim.

### D.     Harmless error

In any event, any error in the admission of Leander's statement was harmless because it did not facially incriminate Thompkins in the murder.  *Brecht*, 507 U.S. at 622; *Richardson*, 481 U.S. at 207.  Rather, Leander implicated only himself; he said, "*I* got that n*****," without any mention of Thompkins' involvement.  (12/15/14 Trial Tr. at 185.)  As far as Ruff knew, Thompkins was in the liquor store before he returned to the car.  (*Id.* at 182.)

Thus, Thompkins is not entitled to habeas relief on this claim.

## CONCLUSION

The state courts' rejection of Thompkins' claims did not result in decisions that were contrary to federal law, unreasonable applications of federal law, or unreasonable determinations of the facts.  Thompkins was "entitled to a fair trial but not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); *see also United States v. Hasting*, 461 U.S. 499, 508–09 (1983) ("[T]here can be no such thing as an error-free, perfect trial" and the Constitution "does not guarantee such a trial.") The state-court decisions in this case were not "so lacking in justification" that they resulted in "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.  The formidable threshold for granting habeas relief has not been met because fairminded jurists could disagree on the correctness of the state court's decision. *Yarborough*, 541 U.S. at 664.  Consequently, habeas relief should be denied.

Additionally, the State opposes any requests for bond, oral argument, or any other relief, including a certificate of appealability. And the State asserts that Thompkins is not entitled to habeas relief

because he has not established that the alleged errors had a substantial and injurious effect on the verdict in this matter. *See Brecht*, 507 U.S. at 622.

The State also contends that Thompkins has not demonstrated entitlement to discovery. Unlike typical civil litigants, "[h]abeas petitioners have no right to automatic discovery." *Johnson v. Mitchell*, 585 F.3d 923, 934 (6th Cir. 2009) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)). Rule 6(a) permits district courts to authorize discovery in habeas corpus proceedings under the Federal Rules of Civil Procedure only "for good cause." R. Governing 2254 Cases in the U.S. Dist. Cts. 6(a). "Rule 6 embodies the principle that a court must provide discovery in a habeas proceeding only 'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.' " *Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004) (quoting *Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)). "Rule 6 does not 'sanction fishing expeditions based on a petitioner's conclusory allegations.' " *Williams*, 380 F.3d at 974 (quoting *Rector v. Johnson*, 120 F.3d 551, 562 (5th Cir. 1997)); Habeas Rule 6(a). "Conclusory allegations are not

43

enough to warrant discovery under Rule 6; the petitioner must set forth specific allegations of fact." *Williams*, 380 F.3d at 974 (internal quotation marks and citation omitted).  Thompkins has not met this burden.

If this Court denies the petition, the State asserts that Thompkins is also not entitled to a certificate of appealability (COA) so as to proceed further.  In order to obtain a COA, a petitioner must make "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To demonstrate this denial, the petitioner is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further.  *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) ("Under the controlling standard, a petitioner must 'sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (citations omitted).

44

When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Slack*, 529 U.S. at 483–84, *see also Dufresne v. Palmer*, 876 F.3d 248, 254 (6th Cir. 2017) ("To meet *Slack*'s standard, it is not enough for a petitioner to allege claims that are arguably *constitutional*; those claims must also be arguably *valid* or *meritorious*.")

Likewise, when a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claims, a COA should issue, and an appeal of the district court's order may be taken, if the petitioner shows that jurists of reason would find it debatable whether the petitioner states a valid claim of the denial of a constitutional right, and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Slack*, 529 U.S. at 484.

When a plain procedural bar is present, and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or

that the petition should be allowed to proceed further.  In such a circumstance, no appeal would be warranted.  *Id.*, *see also Dufresne*, 876 F.3d at 254.

"At the end of the day, 'the gate keeping functions of certificates of appealability [is to] separate the constitutional claims that merit the close attention of . . . this court from those claims that have little or no viability.' " *Dufresne*, 876 F.3d at 254 (quoting *Porterfield v. Bell*, 258 F.3d 484, 487 (6th Cir. 2001)).  Here, this Court should deny Thompkins a COA on all his claims.  The claims simply "have little or no viability."

## RELIEF

For the reasons stated above, this Court should deny the petition. The Court should also deny Thompkins any requested discovery, evidentiary hearings, bond, oral argument, and any other relief he seeks in this action, including a certificate of appealability.

Respectfully submitted,

Bill Schuette
Attorney General

s/Scott R. Shimkus

Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
shimkuss@michigan.gov
P77546

Dated: December 11, 2018
2018-0222292-A/Thompkins.Deseanta/Answer

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2018, I electronically filed the foregoing papers with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

> HONORABLE PAUL D. BORMAN
> MAGISTRATE STEPHANIE DAWKINS DAVIS

and I hereby certify that Kari Edgecomb has mailed by United States Postal Service the papers to the following non-ECF participant:

> DESEANTA RODERICK THOMPKINS, #500757
> BELLAMY CREEK CORRECTIONAL FACIILTY
> 1727 WEST BLUEWATER HIGHWAY
> IONIA, MI    48846

Respectfully submitted,

Bill Schuette
Attorney General

<u>s/Scott R. Shimkus</u>

Assistant Attorney General
Criminal Appellate Division
P.O. Box 30217
Lansing, MI  48909
(517) 373-4875
shimkuss@michigan.gov
P77546