UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DESEANTA R. THOMPKINS, #500757,

          Petitioner,

                           CASE No. 2:18-CV-11775

v.                             PAUL D. BORMAN
                             United States District Judge

TONY TRIERWEILER,

          Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

## I.   Introduction

This is a habeas case brought pursuant to 28 U.S.C. § 2254.  Michigan prisoner Deseanta R. Thompkins ("Petitioner") challenges his conviction for first-degree premeditated murder, MICH. COMP. LAWS § 750.316(1)(a), which was imposed following a jury trial in the Wayne County Circuit Court.  He was sentenced to life imprisonment without the possibility of parole in 2015.  In his pleadings, Petitioner raises claims concerning the non-disclosure of evidence, the exclusion of a co-defendant's statement, and the admission of

1

witness testimony relating a co-defendant's statements, and the effectiveness of trial counsel.  For the reasons set forth herein, the Court denies the petition for a writ of habeas corpus.  The Court also denies a certificate of appealability and denies Petitioner leave to proceed in forma pauperis on appeal.

## II.  <u>Facts and Procedural History</u>

Petitioner's conviction arises from a fatal shooting at a bus stop in Detroit, Michigan in 2013.  Petitioner was tried in a joint trial with co-defendants Leander Stacey Thompkins ("Leander") and William Roy Lee ("Lee").  Petitioner and Lee were tried before the one jury and Leander was tried before a separate jury.  The Michigan Court of Appeals described the underlying facts, which are presumed correct on habeas review, *see* 28 U.S.C. § 2254(e)(1); *Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009), as follows:

> The twenty-five year old victim in this case, Jonathon Michael Stokes (a/k/a "Slim"), was found shot to death near a bus stop in the City of Detroit on July 31, 2013. The victim's identification was found next to his body. His front pockets were turned inside out as though someone had rummaged through his pockets and his Cartier glasses were nowhere to be found. The victim had been shot five times—four times in the legs and once in his head; all shots were from behind. The four bullets recovered from the victim's body revealed that all bullets came from the same barrel of a .38 caliber weapon.

2

Defendants were charged in the victim's murder and were tried together. Deseanta and Leander are cousins. Deseanta was also known as "D," "De" or "Day." Leander was sometimes referred to as "Le Le." Although tried together, there were two juries—one for Leander and another for Deseanta and Lee. At trial, it was the prosecutor's theory that defendants were upset with the victim and thought he was a "snitch." In contrast, defendants argued that this was a case of mistaken identity and that the shooter was actually Leander's cousin, Dejuan Griffin (Griffin), whose street name was similar to Deseanta's—"Da Da."

Jeffrey Pursey testified that on the night of the murder he was on his way to a liquor store on Seven Mile between Grand River and Telegraph to meet a friend and go to the casino. Pursey was unable to pull into the driveway of the liquor store because there were three individuals in the way. One individual had on dark pants and a black hoody. Another had on dark pants and a white shirt. Pursey was not entirely sure what the third individual was wearing, but knew he was wearing dark clothing. At trial, Pursey identified Lee as the one in the white t-shirt and Deseanta as the one in the hoody. Pursey testified that Lee actually waved Pursey into the parking lot. Pursey's friend arrived within a couple of minutes. Pursey put his phone and charger on his friend's front seat and was planning to go into the liquor store to grab a drink when he heard five gunshots.

Pursey went up to Seven Mile and saw the same three individuals running toward him. Pursey grabbed his phone from his friend's car and dialed 911 while driving to the area. He saw a body lying on the ground. Pursey called 911 and later gave

3

Detective Detrick Mott a written statement and identified Lee from a photo array as the individual who waved him into the parking lot and the one he later saw running towards him. Pursey identified Deseanta from another array as the individual in the black hoody.

All three defendants attacked the credibility of Pursey's testimony because the victim's family had given Pursey $12,000 before trial as a reward for his cooperation. The victim's mother, Dorothy Strong–Stokes, testified that she and her husband had originally put up a $27,500 reward with Crime Stoppers, hoping to apprehend their son's killers. Although Pursey provided critical information in the case and had testified at several preliminary examinations, Crime Stoppers informed Strong–Stokes that Pursey did not qualify to receive the reward because he had not made a tip directly to them. Crime Stoppers told Strong–Stokes that if she wanted Pursey to have the money, she would have to do it herself. They returned the Stokes' money. Strong–Stokes testified that she felt $12,000 was a fair reward. She did not intend the payment as a bribe for Pursey's testimony. Pursey denied that the $12,000 influenced his testimony at a later preliminary examination or at trial. In fact, when Pursey gave his statement to police and positively identified Lee and Deseanta, he was unaware that there was a reward through Crime Stoppers.

The only witness at the bus stop the night of the murder was Castro Pettway. Pettway saw three individuals approaching from the east. One had on a black hoody and another was wearing a white t-shirt. They stopped about 40 feet before the bus stop and were talking amongst themselves. They continued to approach the bus stop when the

4

individual wearing the hoody mentioned something to the victim about a bus and pulled out a gun. Pettway heard and saw the first shot fired and then ran. He heard three or four more shots. Pettway waited approximately five minutes and then went back to retrieve his bag. Pettway could not identify the shooters at trial.

Walter Williams was doing some maintenance in the area where the murder occurred. He heard four gunshots in the distance. From a window, Williams could see that there was a man on the ground and four others around him. Three of the men were kneeling down and appeared to be going through the man's pockets. Like Pettway, Williams could not identify any of the individuals at trial.

Another key witness for the prosecution was Diamond Ruff (Ruff), who testified that she was with all three defendants the night of the shooting. Ruff testified that she had known the victim for seven years and he was once her best friend. She knew Lee as "Will," Deseanta as "De" (the letter), and Leander as "Lee" or "Lee Lee." Ruff testified that both the victim and defendants sold marijuana.

On the day of the murder, Ruff had been drinking Cognac since the morning. She also had been smoking "kush," which she described as a more "exotic" and "stronger" form of weed. Ruff was riding around with defendants in Lee's Yukon or Suburban. She probably "dozed off" in the car from smoking and drinking. At approximately 10:00 p.m., Deseanta went to the store to buy more liquor and blunts. Lee received a phone call and told the caller, "be there in a minute." All three defendants then got out of the car. Defendants returned after approximately 10 minutes. They seemed "hyped

5

up" so Ruff asked them what was happening. Leander said, "I got that n* * * * *, I got that n* * * * *." In her statement to police, Ruff said that Defendant Leander Thompkins said, "I got that n* * * * *, I got that n* * * * * ... I had to pop a n* * * * * a couple of times. That n* * * * * got handled."

Ruff did not know what Leander was talking about. Defendants dropped her off at a friend's house. While at her friend's house, Ruff received a call that the victim was dead. Ruff put together a candlelight vigil, which defendants attended. Although Ruff could have contacted the victim's parents with information about the murder, she was scared to do so. Ruff eventually gave Mott a statement and identified defendants from photo arrays.

As part of his investigation, Mott went to the liquor store to see if there was useable surveillance footage. Because the footage ran a ten hour loop, Mott had to capture the video on his phone's camera. Therefore, as the parties acknowledged, the footage was not good. The jury watched the surveillance video from inside and outside the store.

Mott testified that Lee gave police a statement on November 22, 2013. The video was played for the Deseanta/Lee jury, only. In the statement, Lee told Mott that Leander was there at the time of the shooting, but blamed the shooting on "Day" or "Day Day" (Griffin), who shot the victim because "he was snitching or being an informant in the neighborhood."

Mott testified that Leander also made an informal statement to police on November 22, 2013 at which time Leander indicated he was with his cousin at the time of the shooting. Mott spoke with Leander a

6

second time on November 25, 2013. Leander denied that he was present during the murder, but implicated his cousin, Griffin, saying "that's the kind of person he is." Leander demonstrated for Mott how Griffin shot the victim. Griffin had asked Dwayne Haywood to borrow a weapon, but Leander did not think Griffin was going to kill the victim. Leander vehemently denied being part of the crime. He was released from custody shortly after making his statement, but was later re-arrested after Mott had a chance to interview Ruff and learned that Leander admitted to shooting the victim.

In front of the Deseanta/Lee jury, only, Hasheem Beamon testified that, on the night of the murder, he was with defendants, as well as Haywood, "Da Da" (Griffin) and "50." At some point, Leander, "Da Da" and "50" left; neither Lee nor Deseanta went with them. Shortly after they left, Beamon heard gunshots. The men returned and Leander said that they shot someone named "Slim." Leander said he shot first and then "Da Da" took the gun and "finished him off ." They told Beamon that "Slim" was a snitch: "They told me they had to kill a n* * * * *." Beamon gave Mott a statement on February 19, 2014, identifying both Leander and Deseanta, but adding that Deseanta and Lee "didn't have s* * * to do with this."

Brandy Harris testified that the victim was her cousin. She was planning to pick him up the night of the murder. In a phone call earlier that day, the victim reported that he had just had a fight with someone who had called him a snitch. Harris remembered that one of the houses that the victim frequented had been raided. Later, Harris saw that a Caucasian man had the victim's phone and when Harris asked the man where the victim was, he told

7

her that the victim had gone to the gas station. After learning that the victim had been shot, Harris went to retrieve the victim's phone from the Caucasian man, who threw it at her. Mott acknowledged that a white man on Wormer, Patrick Boggs, was later arrested on unrelated charges. Mott did not believe Boggs was connected to the homicide.

In front of the Deseanta/Lee jury, only, Shenequia Carr (Peaches) testified that she was with Deseanta at her house at the time of the murder. They heard shots and police sirens and walked to where the shooting occurred. In a surveillance photo, Carr identified the man in a hoody as "Da Da," whom she also saw that night. Carr testified she saw Lee with Haywood a couple of doors down. She did not see Ruff with any of the defendants.

Although Leander, Haywood's widow (Roslyn Haywood), Beamon, and Carr, accused "Da Da" (Griffin) of being responsible for the crime, attempts at locating him were unsuccessful. Mott admitted that he initially associated "Da Da" with Deseanta.

*People v. Thompkins*, No. 326028, 2016 WL 4212142, *1–4 (Mich. Ct. App. Aug. 9, 2016) (unpublished) (footnotes omitted).

Following his conviction and sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising the first three claims presented on habeas review. The court denied relief on those claims and affirmed Petitioner's conviction and sentence. *Id*. at pp. 4–8. Petitioner filed an application for leave to appeal with the Michigan Supreme Court raising

the same claims, which was denied in a standard order.  *People v. Thompkins*,

500 Mich. 947, 890 N.W.2d 661 (2017).

Petitioner thereafter filed this federal habeas petition raising the

following claims:

I.      Due process violation: Withholding and suppression of
        material evidence by the prosecution.

II.     Denial of right to a fair trial.  A recorded interview which
        contains exculpatory statements by a co-defendant were
        included in his jury, but excluded from my own.

III.    Confrontation Clause violation.  I was deprived of my rights
        under the Confrontation Clause at trial.

IV.     Ineffective Assistance of Counsel.  Multiple instances before
        and during trial [where] my counsel failed to provide
        effective defense and prejudiced the outcome of my case.
        (ECF No. 1)

Respondent filed an Answer to the habeas petition contending that it should

be denied because the first three claims lack merit but failed to address the

fourth claim. (ECF No. 7.)

## III.  <u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), codified at 28 U.S.C. § 2241 *et seq.*, sets forth the standard of

review that federal courts must use when considering habeas petitions brought

by prisoners challenging their state court convictions.  The AEDPA provides

in relevant part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) Resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) Resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
> 28 U.S.C. § 2254(d)

"A state court's decision is 'contrary to' ... clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.' " *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.' " *Wiggins*, 539 U.S. at 520–21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 521, 333, n. 7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

A state court's determination that a claim lacks merit "precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id*., at 102. Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.,* at 103; *see also White v. Woodall*, 572 U.S. 415, 419–20 (2014). Federal judges "are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Woods v. Donald*, 575 U.S. 312, 316 (2015). A habeas petitioner cannot prevail as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *Woods v. Etherton*, _ U.S. _, 136 S. Ct. 1149, 1152 (2016).

12

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 123 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.' " *Harrington*, 562 U.S. at 100. Furthermore, it "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16.

The requirements of clearly established law are to be determined solely by Supreme Court precedent. Thus, "circuit precedent does not constitute 'clearly established Federal law as determined by the Supreme Court'" and it cannot provide the basis for federal habeas relief. *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam). The

decisions of lower federal courts, however, may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360–61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## IV. <u>Analysis</u>

### A. <u>Non-Disclosure of Evidence Claim</u>

Petitioner first asserts that he is entitled to habeas relief because the prosecutor failed to disclose evidence prior to trial. Specifically, he asserts that the prosecutor failed to disclose the following: (1) co-defendant Leander's recorded police interview in which he inculpated DeJuan Griffin and exculpated Petitioner, (2) the fact that Pursey received a $12,000 reward from the victim's family, and (3) evidence that Petitioner was seen ripping down Crime Stoppers' posters. Respondent contends that this claim lacks merit.

As an initial matter, to the extent that Petitioner asserts that the prosecutor violated a state court discovery order, this claim is not cognizable on habeas review.

14

It is well-settled that there is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  Any violation of state discovery rules raises a state law issue that is not cognizable on habeas review. *See Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002); *Burns v. Lafler*, 328 F. Supp. 2d 711, 723 (E.D. Mich. 2004); *Meade v. Lavigne*, 265 F. Supp. 2d 849, 867 (E.D. Mich. 2003).

Petitioner also asserts a violation of his constitutional rights as to this issue. A prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  To find a *Brady* violation, not only must the evidence be suppressed, it must be material and favorable to the defense. *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985).  Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432–36 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993).  The duty to disclose favorable evidence

includes the duty to disclose impeachment evidence. *Bagley, supra*; *Giglio v. United States*, 405 U.S. 150, 154–55 (1972).

The *Brady* rule only applies to "the discovery, after trial of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). A *Brady* violation does not occur if previously undisclosed evidence is disclosed during trial unless the defendant is prejudiced by its prior non-disclosure. *United States v. Word*, 806 F.2d 658, 665 (6th Cir. 1986). Thus, in order to establish a *Brady* violation, a petitioner must show that: (1) evidence was suppressed by the prosecution in that it was not known to the petitioner and not available from another source; (2) the evidence was favorable or exculpatory; and (3) the evidence was material to the question of guilt. *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000). The petitioner bears the burden of establishing a *Brady* violation. *Id.*

Citing *Brady* and applying the foregoing standards, the Michigan Court of Appeals denied relief on this claim. The court explained in relevant part:

> Deseanta first argues that the prosecutor failed to provide him with Leander's recorded police interview in which Leander inculpated Griffin and exculpated Deseanta. However, as will be discussed in further detail later in this opinion, the evidence was inadmissible in Deseanta's case because Leander's statement was not against Leander's penal interest and lacked sufficient corroborating evidence of trustworthiness. Because the evidence was inadmissible, it cannot be considered material.

16

Deseanta next argues that the prosecutor suppressed evidence that Pursey had received $12,000 from the victim's family as a "reward." Mott testified that he learned Pursey had received the money following the final preliminary hearing in July 2014. Mott should have brought that information to the prosecutor's attention prior to trial, which started several months later in December 2014. Such evidence called into question Pursey's credibility. Still, Deseanta was not deprived of a fair trial. Evidence relating to the $12,000 played a significant role at trial. All of the defendants vigorously attacked Pursey's credibility and the jury was made fully aware that he had been paid prior to trial.

Finally, Deseanta complains that defense counsel was not made aware that Mott saw the defendants pulling down Crime Stopper flyers because such information was not included in Mott's reports. However, as the prosecutor points out, Deseanta fails to indicate how this evidence was favorable to him. In fact, evidence that Deseanta was seen taking down Crime Stoppers posters seems rather incriminating. To the extent Deseanta argues that the evidence (or lack thereof) was relevant to Mott's overall credibility, defense counsel pursued Mott's failure to include the information in his reports. The jury was, therefore, apprised of Mott's alleged lack of credibility. There is simply no indication that the "evidence" was material to Deseanta or deprived him of a fair trial.

*Thompkins*, 2016 WL 4212142 at *4–5.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts.   First, as to Leander's interview, it is well-settled that "withheld information is material under *Brady* only if it would have been admissible at trial or would have led directly to admissible evidence." *Gumm v. Mitchell*, 775 F.3d 345, 363 (6th Cir. 2014).   The Sixth Circuit

17

has noted that inadmissible information "is not evidence at all" for purposes of *Brady* and therefore cannot directly affect the outcome of a trial. *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 n. 3 (6th Cir. 2012) (internal citation omitted). Given the state court's ruling that Leander's statements to police were inadmissible hearsay and given that Petitioner neither alleges nor establishes that the interview would have directly led to admissible evidence, Petitioner cannot establish a *Brady* violation.

As to Pursey's reward, the record shows that while Detective Mott knew about this information before trial, the prosecutor first learned of it during jury voir dire, then promptly investigated and disclosed it to the defense. *See* 12/4/14 Trial Tr., pp. 144–146, ECF No. 8-10, PageID.1225–1227; 12/8/14 Trial Tr., pp. 228-229, ECF No. 8-11, PageID.1565–1566. Petitioner was thus aware of this impeachment evidence at the time of trial and, along with the other defendants, had the opportunity to thoroughly explore this issue while questioning witnesses at trial. *See* 12/15/14 Trial Tr., pp. 99–106, 124–126, 139–143, 155–159, ECF No. 8-15, PageID.2419–2426, 2444–2446, 2459–2463, 2475–2479. Petitioner fails to show that his defense was impaired by the late disclosure of the reward payment so as to establish a *Brady* violation.

With respect to the flyers, this information was disclosed at the time of trial and Petitioner fails to show that such information was particularly relevant or

material or, more importantly, that it was exculpatory. To be sure, such evidence seems to be rather inculpatory. Consequently, Petitioner fails to establish a *Brady* violation or to otherwise show that the admission of this testimony rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

## B. Exclusion of Evidence Claim

Petitioner relatedly asserts that he is entitled to habeas relief because he was denied the right to present a defense when the trial court excluded co-defendant Leander's police statement that DeJuan Griffin was the shooter as inadmissible hearsay. Respondent contends that this claim lacks merit.

A federal court may only grant habeas relief to a person who is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle v. McGuire*, 502 U.S. 62, 63 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348 (6th Cir. 1993). An error in state procedure or evidentiary law does not rise to the level of a federal constitutional claim warranting habeas relief, "unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *Estelle*, 502 U.S. at 69–70); *see*

*also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (citing *Bey v. Bagley*, 500 F.3d 514, 519–20 (6th Cir. 2007)); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

The right of an accused to present a defense has long been recognized as "fundamental element of due process." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *see also Holmes v. South Carolina*, 547 U.S. 319, 329–31 (2006); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). A defendant's right to present a defense is not unlimited, however, and may be subject to "reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). For example, a defendant "does not have an unfettered right to offer evidence that is incompetent, privileged, or otherwise inadmissable under standard rules of evidence." *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (quoting *Taylor v. Illinois*, 484 U.S. 400, 410 (1988)); *see also Holmes*, 547 U.S. at 326 (recognizing that "well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"). State rules excluding evidence from criminal trials "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (internal citations omitted). "A defendant's interest in presenting . . . evidence may thus bow to accommodate other legitimate interest in the criminal

20

trial process." *Id.* In such cases, the question is not whether the jury would reach a different result, but whether the defendant was afforded "a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *Chambers*, 410 U.S. at 302.

The Michigan Court of Appeals denied relief on this claim as a matter of state and federal law. The court explained in pertinent part:

> In Leander's November 25, 2013 statement, Leander implicated his cousin Griffin, indicating that Griffin had an argument with the victim, borrowed a gun, and boasted of shooting the victim.
>
> Leander's statement to police was hearsay. "'Hearsay' is a statement, other than the one made by the defendant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(d). Hearsay is not admissible except as provided by the rules of evidence. A statement against penal interest is only admissible if the declarant is unavailable.5 MRE 804(b)(3) provides:
>
> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

The trial court correctly concluded that Leander's statement to police did not constitute a statement against his own penal interest; instead, Leander asserted that he was merely present when some of the discussions took place and otherwise vehemently denied any wrongdoing. Leander's statement did not, on its face, facially expose Leander to criminal liability.

In any event, even if Leander's statement could be construed as against his penal interest, because the statement was offered to exculpate Deseanta from criminal liability, an additional hurdle had to be cleared. As the proponent of the evidence, Deseanta had to show that corroborating circumstances clearly indicated the trustworthiness of Leander's statement. MRE 804(b)(3). In *People v. Poole*, 444 Mich. 151, 163; 506 NW2d 505 (1993), *overruled in part by People v. Taylor*, 482 Mich. 368, 378; 759 NW2d 361 (2008), the Supreme Court discussed "[t]he indicia of reliability necessary to establish that a hearsay statement has particularized guarantees of trustworthiness" and concluded:

In evaluating whether a statement against penal interest that inculpates a person in addition to the declarant bears sufficient indicia of reliability to allow it to be admitted as substantive evidence against the other person, courts must evaluate the circumstances surrounding the making of the statement as well as its content.

The presence of the following factors would favor admission of such a statement: whether the statement was (1) voluntarily given, (2) made contemporaneously with the events referenced, (3) made to family, friends, colleagues, or confederates—that is, to someone to whom the declarant would likely speak the truth, and (4) uttered spontaneously at the initiation of the declarant and without prompting or inquiry by the listener.

On the other hand, the presence of the following factors would favor a finding of inadmissibility: whether the

statement (1) was made to law enforcement officers or at the prompting or inquiry of the listener, (2) minimizes the role or responsibility of the declarant or shifts blame to the accomplice, (3) was made to avenge the declarant or to curry favor, and (4) whether the declarant had a motive to lie or distort the truth. [*Id.* at 165.]

Granted, and as discussed in further detail below, *Poole* was subsequently partially overruled in *Taylor* to the extent *Poole* found that the Confrontation Clause had any application to nontestimonial statements. And Leander's statement was not being used as substantive evidence against another person. But the factors *Poole* discusses when looking to whether a statement has sufficient indicia of trustworthiness is still helpful. Here, Leander's statement was made to law enforcement during an interrogation at which time Leander minimized his role and shifted blame to Griffin. Leander had a strong motivation to lie or distort the truth and his statement was primarily self-serving. Under those circumstances, it cannot be said that Leander's statement to police had sufficient corroborating circumstances indicating the trustworthiness of his statement. The trial court, therefore, did not abuse its discretion in refusing to permit Deseanta to present the statement to the jury.

Although the trial court refused to permit Deseanta to present Leander's statement to the jury, Deseanta was not denied his right to present a defense and, in fact, placed blame for the shooting squarely on Leander and Griffin. At trial, Beamon testified that Leander and Griffin admitted to shooting "Slim" for being a snitch, with Leander firing the first shot and Griffin "finishing him off." Beamon gave Mott a statement on February 19, 2014, identifying both Leander and Deseanta, but adding that Deseanta "didn't have s* * * to do with this." Additionally, in his statement to police, Lee blamed the shooting on Griffin. Deseanta was able to present the jury with his theory that he was mistaken for Griffin based on their

23

similar street names. Defendant was not denied his right to
present a defense.

*Thompkins*, 2016 WL  4212142 at \*5–7.

The state court's decision is neither contrary to Supreme Court precedent nor
an unreasonable application of federal law or the facts.  First, to the extent that
Petitioner asserts that the trial court erred in excluding the testimony under the
Michigan Rules of Evidence or other Michigan law, he merely alleges a violation
of state law which does not entitle him to federal habeas relief.  *See, e.g., Wheeler
v. Jones*, 59 F. App'x 23, 28 (6th Cir. 2003).  State courts are the final arbiters of
state law and the federal courts will not intervene in such matters.  *See Lewis v.
Jeffers*, 497 U.S. 764, 780 (1990); *see also Bradshaw v. Richey*, 546 U.S. 74, 76
(2005); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002).

Second, Petitioner fails to show that the exclusion of the proposed testimony
violated his constitutional rights. The trial court's ruling was reasonable and meant
to preclude the admission of hearsay under state law because the declarant, co-
defendant Leander, gave the statements in a police interview but did not testify at
trial.  The hearsay statements that the defense sought to admit did not fit within any
exceptions to the hearsay rule.  Those statements were also not reliable given that
co-defendant Leander sought to minimize his own involvement by asserting that he
was merely present and that Griffin was responsible for the shooting.

More importantly, Petitioner was able to present evidence in support of his defense that he was not involved in the crime and that Griffin was the shooter. For example, Hasheem Beamon testified that Leander and Griffin admitted shooting the victim for being a snitch with Leander firing the first shot and Griffin finishing him off, and that Petitioner was not involved in the shooting. Beamon also gave the police a statement in which he identified Leander and Griffin and said that Petitioner was not involved. *See* 1/8/15 Trial Tr., pp. 139–141, 163, 185, 188, ECF No. 8-18, PageID.3024–3026, 3048, 3070, 3073. Additionally, Petitioner presented an alibi defense through witness Shenequia Carr, *see* 1/13/15 Trial Tr., pp. 106–108, ECF No. 8-20, PageID.3408–3410, and argued his defense theory that others were responsible for the shooting and he was mistaken for Griffin based upon their similar street names. *See* 1/15/15 Trial Tr., pp. 19, 23, ECF No. 8-23, PageID.3762, 3766. Lastly, Petitioner challenged the credibility of prosecution witnesses, pointed out inconsistencies in the testimony, and argued that there was reasonable doubt about his involvement in the crime. The record thus reveals that Petitioner was able to present a meaningful defense at trial. *See, e.g., Wynne v. Renico*, 606 F.3d 867, 870–71 (6th Cir. 2010) (state trial court did not violate petitioner's right to present a defense at murder trial by excluding propensity evidence of third party guilt where defendant had opportunity to present other, proper evidence in support of defense theory). Petitioner fails to establish that the trial court's evidentiary ruling violated

25

his right to present a defense or otherwise rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### C.   <u>Confrontation & Evidentiary Claim</u>

Petitioner also asserts that he is entitled to habeas relief because the trial court violated his confrontation rights by admitting co-defendant Leander's statements to Diamond Ruff in which he admitted shooting the victim.  Respondent contends that this claim lacks merit.

The Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause provides criminal defendants the right to confront and cross-examine witnesses against them.   *See, e.g., Davis v. Alaska*, 415 U.S. 308, 315 (1973).  The right to confront adverse witnesses generally prevents a court from admitting an out-of-court statement against a criminal defendant.  *California v. Green*, 399 U.S. 149, 155–58 (1970).   The Sixth Amendment protections, however, are not so broad as to exclude the admission of all hearsay statements against a defendant despite his or her inability to confront the declarant at trial.  *See Maryland v. Craig*, 497 U.S. 836, 847–48 (1990).   The constitutionality of admitting a hearsay statement depends on whether the statement is testimonial or non-testimonial in nature and on the circumstances surrounding the making of the statement.

26

In *Bruton v. United States*, 391 U.S. 123, 126 (1968), the Supreme Court ruled that the admission at a joint trial of a non-testifying co-defendant's confession to police which implicates the defendant violates the Confrontation Clause even if the trial court instructs the jury not to consider the incriminating statements in determining the defendant's guilt.   An exception to this rule is when the co-defendant's confession "is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).   No *Bruton* violation results when a co-defendant's statement does not expressly implicate a defendant in the charged offense because such a statement is not "powerfully incriminating."   *Vincent v. Parke*, 942 F.2d 989, 991 (6th Cir. 1991).   Rather, *Bruton* only applies when a "codefendant's confession 'expressly implicat[es]' the defendant as [an] accomplice." *Marsh*, 481 U.S. at 208 (quoting *Bruton*, 391 U.S. at 124, n. 1).

In *Crawford v. Washington*, 541 U.S. 36, 54 (2004), the Supreme Court held that the *testimonial* statement of a witness who does not appear at trial is inadmissible unless the witness is unavailable to testify and the defendant has had a prior opportunity to cross-examine the witness.   Testimonial statements include preliminary hearing testimony, grand jury testimony, prior trial testimony, and statements made during police interrogations.   Testimonial statements do not include remarks made to family members or acquaintances, business records, or

statements made in furtherance of a conspiracy. *Id*. at 51–52, 56; *United States v. Martinez*, 430 F.3d 317, 328–29 (6th Cir. 2005); *see also United States v. Stover*, 474 F.3d 904, 912–13 (6th Cir. 2007). Additionally, the Confrontation Clause is not implicated, and need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U.S. 813, 823–24 (2006); *see also Whorton v. Bockting*, 549 U.S. 406, 420 (2007) (noting that the Confrontation Clause "has no application to such statements and therefore permits their admission even if they lack indicia of reliability"); *Doan v. Carter*, 548 U.S. 449, 458 (6th Cir. 2008).

The Michigan Court of Appeals denied relief on this claim, explaining in relevant part:

> A defendant's Sixth Amendment right to confront the witnesses against him is violated if the trial court allows the admission of a non-testifying codefendant's confession implicating the defendant at a joint trial. *Bruton*, 391 U.S. at 127–128; *Pipes*, 475 Mich. at 269. Additionally, out-of-court testimonial statements by nontestifying witnesses are not admissible under the Confrontation Clause unless the witness is unavailable and the defendant had an opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 51–52; 124 S Ct 1354; 156 L Ed 2d 177 (2004); *People v. Nunley*, 491 Mich. 686, 698; 821 NW2d 642 (2012).
>
> However, *Crawford* has no application in this case because Leander's statement was non-testimonial in nature. "[T]he right of confrontation is concerned with a specific type of out-of-court statement, i.e., the statements of 'witnesses,' those people who bear testimony against a defendant." *People v. Fackelman*, 489 Mich. 515, 528;

802 NW2d 552 (2011). Our United States Supreme Court has explained:

The text of the Confrontation Clause ... applies to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." Ibid. An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement. [*Crawford*, 541 U.S. at 51.]

Nor does *Bruton* have any application to this case because, not only was Leander's statement non-testimonial, but Leander did not specifically implicate Deseanta or Lee or attempt to shift the blame for the shooting onto his codefendants. When nontestimonial hearsay is at issue, the states are afforded the opportunity to create their own rules of admissibility. *Crawford*, 541 U.S. at 68. Thus, the relevant inquiry is whether Leander's statement to Ruff qualifies under the rules of evidence. The trial court found Leander's statement admissible both as an excited utterance and as a statement against penal interest.

*Thompkins*, 2016 WL 4212142 at *7–8 (footnote omitted).

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. First, Petitioner is not entitled to relief on any perceived violation of Michigan law with respect to this issue. As discussed, alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief. *See Estelle*,

502 U.S. at 67–68; *Serra*, 4 F.3d at 1354.  Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness" may it violate due process and warrant habeas relief.  *McAdoo*, 365 F.3d at 494 (citing *Estelle*, 502 U.S. at 69–70); *see also Wynne*, 606 F.3d at 871 (citing *Bey*, 500 F.3d at 519–20); *Bugh*, 329 F.3d at 512.

Second, Petitioner fails to establish a constitutional violation.  Leander's statements to Ruff were non-testimonial and did not directly implicate Petitioner in the shooting.  Consequently, the admission of those statements did not violate Petitioner's constitutional rights, *see, e.g., United States v. Boyd*, 640 F.3d 657, 665 (6th Cir. 2011) ("[S]tatements made to friends and acquaintances are non-testimonial."); *United States v. Johnson*, 581 F.3d 320, 326 (6th Cir. 2009) ("Because it is premised on the Confrontation Clause, the *Bruton* rule, like the Confrontation Clause itself, does not apply to nontestimonial statements."), or otherwise render his trial fundamentally unfair.  Habeas relief is not warranted on this claim.

Petitioner further asserts that he is entitled to habeas relief because the trial court erred in allowing Diamond Ruff to identify Petitioner in the liquor store surveillance video.  Respondent did not address this issue as part of this claim.

Again, as discussed, alleged trial court errors in the application of state evidentiary law are generally not cognizable as grounds for federal habeas relief.

*See Estelle*, 502 U.S. at 67–68; *Serra*, 4 F.3d at 1354.  Only when an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness" may it violate due process and warrant habeas relief.  *McAdoo*, 365 F.3d at 494 (citing *Estelle*, 502 U.S. at 69–70); *see also Wynne*, 606 F.3d at 871 (citing *Bey*, 500 F.3d at 519–20); *Bugh*, 329 F.3d at 512.

The Michigan Court of Appeals denied relief on this claim.  The court explained:

> Ruff testified that she had the opportunity to observe surveillance videos. The prosecutor played the video and Ruff identified the liquor store and Lee's vehicle in the parking lot. She also identified Deseanta as the man inside the store, covering his face.
>
> The identification testimony in this case constituted lay opinion testimony. *Fomby*, 300 Mich App at 50. MRE 701 provides: "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." In *Fomby*, this Court cited federal case law that "the issue of whether the defendant in the courtroom was the person pictured in a surveillance photo was a determination properly left to the jury." *Fomby*, 300 Mich App at 52. "[W]here a jury is as capable as anyone else of reaching a conclusion on certain facts, it is error to permit a witness to give his own opinion or interpretation of the facts because it invades the province of the jury." *People v. Drossart*, 99 Mich App 66, 80; 297 NW2d 863 (1980). In *Fomby*, the Court concluded that there was no reason to believe that the witness who offered the identifying testimony was "more likely to identify correctly the person than is the jury" and,

> in so doing *Fomby* Court acknowledged that there are
> times when specific identification testimony is
> appropriate. *Id*. (internal quotation marks omitted).
>
>
> Here, Ruff testified that she was well acquainted with all
> of the defendants and had known them for several months
> before the night of the murder. She had spent the evening
> with them and was present when they were at the liquor
> store. Because the video was on a loop and was in jeopardy
> of being taped over, Mott had to capture the images on his
> phone. By all accounts, the footage was grainy and shaky.
> Ruff was, therefore, more likely to correctly identify the
> individual in the surveillance video than the jury and did
> not invade the province of the jury.

*Thompkins*, 2016 WL 4212142 at *8.

The state court's decision is neither contrary to Supreme Court precedent nor

an unreasonable application of federal law or the facts.  First, there is generally no

prohibition on a witness offering opinion testimony which goes to an ultimate issue

in a case.  Both the Federal and Michigan Rules of Evidence permit such testimony.

*See* Fed R. Evid. 704(a); Mich. R. Evid. 704.  Thus, there is no clearly established

federal law as determined by the Supreme Court which suggests that the admission

of such evidence violates the Constitution.  *See, e.g., Davis v. Trierweiler*, No. 15-

14420, 2018 WL 1586487, *10 (E.D. Mich. March 31, 2018) (citing *Hopp v. Burt*,

No. 03-10153, 2007 WL 162248, *9 (E.D. Mich. Jan. 16, 2007)).

Second, Petitioner fails to show that Ruff's identification testimony was

improper or that its admission violated his due process rights.  Under Michigan law,

lay opinion testimony is admissible if it is "(a) rationally based on the perception of

32

the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."   Mich. R. Evid. 701.   In this case, Ruff's identification of Petitioner from the liquor store surveillance video was based upon her familiarity with him and her presence at the scene.   Her testimony helped the jury to determine whether Petitioner was in the liquor store at the time in question, particularly since the video recording was not of the clearest quality.   Consequently, Petitioner fails to establish that the admission of Ruff's identification testimony was improper or that it rendered his trial fundamentally unfair.   Habeas relief is not warranted on this claim.

### D.   Ineffective Assistance of Counsel Claim

Lastly, Petitioner asserts that he is entitled to habeas relief because trial counsel was ineffective for agreeing to a separate jury from co-defendant Leander and for failing to properly cross-examine Detective Mott and Diamond Ruff. Respondent does not address this claim.

The record indicates that Petitioner did not raise this claim on direct appeal in the state courts.   It is well-established, however, that a state prisoner filing a federal habeas petition under 28 U.S.C. §2254 must first exhaust available state remedies as to each of his or her claims.   *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845 (1999) ("state prisoners must give the state courts one full fair opportunity to resolve any constitutional issues by invoking one complete round of the State's established

appellate review process"); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). Petitioner did not do so with respect to this claim. Consequently, it is unexhausted and subject to dismissal.

The Court, however, declines to dismiss the claim (or the case) on such a procedural basis. While the exhaustion requirement is strictly enforced, it is not a jurisdictional prerequisite for bringing a habeas petition. *Granberry v. Greer*, 481 U.S. 129, 134–35 (1987); *Rockwell v. Yukins*, 217 F.3d 421, 423 (6th Cir. 2000). For example, an unexhausted claim may be addressed if the pursuit of state court remedies would be futile, *Witzke v. Withrow*, 702 F. Supp. 1338, 1348 (W.D. Mich. 1988), or if the unexhausted claim is meritless such that addressing it would be efficient and not offend federal-state comity. *Prather v. Rees*, 822 F.2d 1418, 1422 (6th Cir. 1987)*; see also* 28 U.S.C. § 2254(b)(2) (habeas petition may be denied on the merits despite the failure to exhaust state remedies). Such is the case here. The interests of justice are best served by adjudicating the merits of this claim. Because the state courts have not addressed this issue, the Court shall review the claim *de novo*.

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court set forth a two-prong test for determining whether a habeas petitioner has received ineffective

assistance of counsel.  First, a petitioner must prove that counsel's performance was deficient.  This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687.  Second, the petitioner must establish that counsel's deficient performance prejudiced the defense.  Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal.  *Id*.

To satisfy the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance."  *Id*. at 690.  The reviewing court's scrutiny of counsel's performance is highly deferential.  *Id*. at 689.  There is a strong presumption that trial counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  *Id*. at 690.  The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy.

As to the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Id*. at 694.  A reasonable probability is one that is sufficient to undermine confidence in the outcome of the proceeding.  *Id*.  "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process

that the [proceeding] cannot be relied on as having produced a just result."
*Strickland*, 466 U.S. at 686.

The Supreme Court has confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*.

Because Petitioner did not raise his ineffective assistance of trial counsel claim in the state courts on direct appeal, neither the Michigan Court of Appeals nor the Michigan Supreme Court addressed the issue. Consequently, the Court shall conduct a de novo review of the claim. *See, e.g., Ferensic v. Birkett*, 451 F. Supp. 2d 874, 887 (E.D. Mich. 2006) (performing de novo review of unexhausted habeas claim).

Petitioner first asserts that trial counsel was ineffective for agreeing to a separate jury from that of co-defendant Leander. Petitioner believes that if they had one jury Leander's police statements (implicating Griffin) would have been

36

admissible in his case and provided exculpatory evidence. Petitioner is mistaken. First, Petitioner fails to show that counsel was deficient for agreeing to have a separate jury from that of Leander. The record indicates that counsel agreed to a separate jury because the prosecution erroneously told the parties and the court that Leander's police interview implicated Petitioner in the shooting. At the time, Leander's statement had not yet been provided to the parties. *See* 1/13/15 Trial Tr., pp. 41–42, ECF No. 8-20, PageID.3343–3344. Given the prosecution's misrepresentation and the timing of events, it was reasonable for counsel to agree to a jury separate from Leander. To be sure, counsel initially moved for a separate jury for Petitioner because the prosecution had more incriminating evidence against his co-defendants, particularly Leander, than against him (although that initial motion was denied by the trial court). *See* 11/21/14 Hrg. Tr., ECF No. 8-6.

Second, Petitioner fails to establish prejudice. If there had been one jury, Leander's statement would have still been hearsay with respect to Petitioner and deemed inadmissible against him as was done before his separate jury. *See* discussion *supra*. In fact, the trial court explicitly stated that if the defendants had been tried before one jury, it would have instructed the jurors that they could only consider Leander's statement against him and could not consider it with respect to the other defendants. *See* 1/13/15 Trial Tr., p. 43, ECF No. 8-20, PageID.3345. Jurors are presumed to follow the court's instructions. *See Penry v. Johnson*, 532

U.S. 782, 799 (2001) (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)); *United States v. Powell*, 469 U.S. 57, 66 (1984) ("Jurors ... take an oath to follow the law as charged, and they are expected to follow it.").  Consequently, Petitioner cannot establish that he was prejudiced by counsel's conduct.  He fails to show that trial counsel was ineffective under the *Strickland* standard.

Petitioner also asserts that trial counsel was ineffective for failing to properly cross-examine Detective Mott about his initial mix up of Petitioner's and Griffin's identities due to their similar street names.  The record, however, indicates that counsel cross-examined Mott about the issue specifically and Mott admitted his mistake.  *See* 1/12/15 Trial Tr., p. 125, ECF No. 8-19, PageID.3256.  Counsel also discussed Mott's mix-up, as well as other perceived mistakes in his handling of the investigation, during closing arguments.  *See* 1/15/15 Trial Tr., pp. 19, 20-23, ECF No. 8-23, PageID.3762, 3764–3766.  Counsel's conduct was reasonable.  The fact that counsel's argument was ultimately unsuccessful does not mean that counsel was ineffective.  *See Moss v. Hofbauer*, 286 F.3d 851, 859 (6th Cir. 2002) (an ineffective assistance of counsel claim "cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken").  Moreover, Petitioner fails to indicate what more counsel could have done to benefit his defense as to this issue.  Conclusory allegations are insufficient to warrant habeas relief. *See Cross v. Stovall*, 238 F. App'x 32, 39–40 (6th Cir. 2007); *Workman v. Bell*, 178

38

F.3d 759, 771 (6th Cir. 1998) (conclusory allegations of ineffective assistance of counsel do not justify federal habeas relief); *see also Washington v. Renico*, 455 F.3d 722, 733 (6th Cir. 2006) (bald assertions and conclusory allegations do not provide sufficient basis for an evidentiary hearing in habeas proceedings). Petitioner fails to show that trial counsel was ineffective under the *Strickland* standard.

Lastly, Petitioner asserts that trial counsel was ineffective for failing to properly investigate and cross-examine Diamond Ruff because counsel did not learn that there was a man named Diamond Williamson, as well as a woman named Diamond Ruff, involved in this case and that Ruff was part of Griffin's crew that committed robberies and other crimes. Petitioner states that this information was in Leander's police interview, which was not provided to the defense until the time of trial. As an initial matter, Petitioner fails to show that trial counsel was deficient for not discovering or investigating this information, given that Leander's interview was not disclosed to the defense until the time of trial. Counsel cannot be deemed deficient for the prosecution's late disclosure.

Nonetheless, Petitioner also fails to establish that he was prejudiced by counsel's conduct. First, he fails to show how information about Diamond Williamson would have benefitted his defense. As noted, conclusory allegations are insufficient to justify habeas relief. *See Cross*, 238 F. App'x at 39–40;

*Workman*, 178 F.3d at 771; *see also Washington*, 455 F.3d at 733.  Second, while information that Diamond Ruff was "part of Griffin's crew" might have provided impeachment evidence, the record indicates that counsel (along with counsel for the co-defendants) cross-examined Ruff and made reasonable efforts to challenge her version of events and impeach her credibility.  In particular, counsel emphasized Ruff's relationship/friendship with the victim, her drinking/drug use, her conflicting statements, and the fact that she did not witness the shooting.  *See* 12/16/14 Trial Tr., pp. 38-42, 85, ECF No. 8-16, PageID.2598–2602, 2645.  Counsel also attacked Ruff's credibility during closing arguments.  *See* 1/15/15 Trial Tr., pp. 15-16, ECF No. 8-23, PageID.3758–3759.  Given such circumstances, Petitioner fails to establish that trial counsel was ineffective under the *Strickland* standard.  Habeas relief is not warranted on this claim.

## V.   Conclusion

For the reasons stated, the Court concludes that Petitioner's claims lack merit and that he is not entitled to federal habeas relief.  Accordingly, the Court **DENIES** and **DISMISSES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before Petitioner may appeal this decision, a certificate of appealability must issue.  *See* 28 U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b).  A certificate of appealability may issue only if the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  When a court denies relief

on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that ... jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Having conducted such a review, the Court concludes that Petitioner fails to make a substantial showing of the denial of a constitutional right as to his habeas claims. Accordingly, the Court **DENIES** a certificate of appealability.

Lastly, the Court concludes that an appeal from this decision cannot be taken in good faith. *See* FED. R. APP. P. 24(a). Accordingly, the Court **DENIES** Petitioner leave to proceed in forma pauperis on appeal. This case is **CLOSED**.

**IT IS SO ORDERED**.

Dated: February 17, 2021                         s/Paul D. Borman

                                                 Paul D. Borman
                                                 United States District Judge

41